**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MILDRED TAYLOR and JESSICA AMOR, derivatively on behalf of BELLICUM PHARMACEUTICALS, INC. | Civil Action No.**:**_____ |
| Plaintiffs, | |
| v. | **DEMAND FOR JURY TRIAL** |
| RICHARD A. FAIR, THOMAS J. FARRELL, ALAN A. MUSSO, ANNEMARIE MOSELEY, JAMES F. BROWN, JAMES M. DALY, STEPHEN R. DAVIS, REID M. HUBER, JON P. STONEHOUSE, FRANK B. MCGUYER, and KEVIN M. SLAWIN, | |
| Defendants, | |
| and | |
| BELLICUM PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Mildred Taylor and Jessica Amor ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of nominal defendant Bellicum Pharmaceuticals, Inc. ("Bellicum" or the "Company"), submit this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) as officers and/or directors of Bellicum for breaches of fiduciary duty, waste of corporate assets, and violations of Sections 10(b), 14(a), and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiffs base their allegations on personal knowledge as to their own acts, and on information and belief as to all other allegations, based

upon investigation by counsel, including, but not limited to, a review and analysis of: (i) regulatory filings made by Bellicum with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Bellicum; (iii) a purported securities class action lawsuits filed in the United Stated District Court for the Southern District of Texas, entitled *Kakkar v. Bellicum Pharmaceuticals, Inc.*, Case 4:18-cv-00338 (S.D.T.X.) (the "Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly-available information, including media and analyst reports, concerning Bellicum.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of Bellicum's officers and members of the Company's Board of Directors (the "Board") and their affiliates. Plaintiffs seek to remedy Defendants' violations of state and federal laws from January 13, 2015 through January 30, 2018 (the "Relevant Period") that have caused and continue to cause substantial monetary damages to Bellicum and other damages, including damages to its reputation and goodwill.

2.     Bellicum, a biopharmaceutical company that has never sold a drug, was valued by investors and analysts based on the prospects of new drugs, including the Company's lead drug candidate BPX-501.

3.     BPX-501 is a drug designed to mitigate risks of stem cell transplantation meant for treating blood related cancers. Hoping to commercialize BPX-501, the Company conducted Phase 1/2 clinical testing of the drug beginning in 2014 to prove to the U.S. Food and Drug Administration (the "FDA") that the drug was safe and effective.

4.     The Individual Defendants assured investors that the clinic testing process was advancing and touted that BPX-501 was safe.  During the Relevant Period, however, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

5.     Despite the Individual Defendants' assurance to investors that the Company followed the FDA's "Good Clinical Practices," the clinical trial procedures and protocols had a serious deficiency with monitoring and management of neurological adverse events.  Indeed, during the Relevant Period, the Individual Defendants had access to the Company's safety database where severe adverse events like encephalopathy was recorded within four hours of occurrence.  Further, the company was also required to report these adverse events to the FDA within fifteen days of occurrence regardless of whether the Company reached a determination as to any causal link between the adverse events and BPX-501.

6.     Conceding that they possessed knowledge of the adverse information, the Individual Defendants took action, including slowing down the drug significantly, hiring an expert on encephalopathy risks in stem cell transplantation procedures to be their Vice President of Clinical Development, and forcing defendant Moseley to resign as Chief Operating Officer and Executive Vice President of Clinical Development.

7.     Finally, during the Relevant Period, the Individual Defendants negligently issued a materially false and misleading proxy statements urging stockholders to reelect certain of the Director Defendants under false pretenses.

8.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Bellicum has sustained damages as described below.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Sections 10(b), 14(a), and 20D of the Exchange Act (15 U.S.C. §§ 78j(b), 78u-4(f), and 78n), and SEC Rules 10b-5 and 14a-9 (17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9) promulgated thereunder.

10.     Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

11.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Bellicum is incorporated in this District.  In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

14.     Plaintiff Mildred Taylor is a current stockholder of Bellicum common stock. Plaintiff Mildred Taylor has continuously held Bellicum common stock since at least September 2017.

15.     Plaintiff Jessica Amor is a current stockholder of Bellicum Common stock. Plaintiff Jessica Amor has continuously held Bellicum Common stock since at least June 2017.

16.     Bellicum is a Delaware corporation with its principal executive offices at 2130 West Holcombe Boulevard, Suite 800, Houston, Texas 77030.  Bellicum's common stock shares trade on the Nasdaq Global Select Market ("NASDAQ-GS") under the ticker symbol "BLCM."

17.     Defendant Richard A. Fair ("Fair") has served as the Company's President and Chief Executive Officer ("CEO") and a director of the Company's Board since January 2017.  Fair is named as a defendant in the Securities Class Action.  According to the Company's filings with the SEC, defendant Fair received $4,378,125 from the Company in compensation in 2018.

18.     Defendant Thomas J. Farrell ("Farrell") was the Company's CEO between February 2006 and January 2017, a member of the Company's Board between April 2007 and January 2017, and the Company's President between November 2011 and January 2017. Defendant Farrell is named as a defendant in the Securities Class Action.  According to the Company's filings with the SEC, defendant Farrell received $2,649,129 from the Company in compensation in 2016.  During the Relevant Period, defendant Farrell sold the following shares with insider information regarding Bellicum's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Bellicum stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| August 3, 2015 | 2,500 | $20.24 | $50,608 |
| September 1, 2015 | 2,500 | $16.78 | $41,943 |
| October 1, 2015 | 2,500 | $14.58 | $36,442 |

19.     Defendant Alan A. Musso ("Musso") was the Company's Chief Financial Officer ("CFO") and Treasurer between November 2014 and August 2018.  Defendant Musso is named as a defendant in the Securities Class Action.  According to the Company's filings with the SEC,

defendant Musso received $1,072,856 from the Company in compensation in 2018. During the Relevant Period, defendant Musso sold the following shares with insider information regarding Bellicum's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Bellicum stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| November 24, 2015 | 29,300 | $22.34 | $654,459 |
| November 25, 2016 | 29,300 | $19.51 | $571,641 |
| May 25, 2017 | 6,311 | $12.24 | $77,254 |
| November 27, 2017 | 6,206 | $9.89 | $61,382 |
| December 11, 2017 | 17,117 | $9.32 | $159,667 |
| May 25, 2018 | 6,206 | $7.97 | $49,446 |

20.     Defendant Annemarie Moseley ("Moseley") was the Company's Chief Operating Officer ("COO") and Executive Vice President of Clinical Development between November 2012 and July 2017. Defendant Moseley continued on with the Company as a consultant until January 2019. According to the Company's filings with the SEC, defendant Moseley received $2,087,461 from the Company in compensation in 2016. During the Relevant Period, defendant Moseley sold the following shares with insider information regarding Bellicum's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Bellicum stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| July 1, 2015 | 35,000 | $20.62 | $721,622 |
| January 4, 2016 | 35,000 | $19.07 | $667,494 |
| June 2, 2016 | 25,000 | $13.00 | $325,000 |
| December 1, 2016 | 25,000 | $17.54 | $438,505 |

21.     Defendant James F. Brown ("Brown") has served as a member of the Company's Board since November 2011 and as Chairman of the Board since December 2014. Defendant

Brown was a member of the Company's Audit Committee during the Relevant Period.  According to the Company's filing with the SEC, defendant Brown received $145,509 in compensation from the Company in 2018.

22.     Defendant James M. Daly ("Daly") has served as a member of the Company's Board since May 2016.  According to the Company's filings with the SEC, defendant Daly received $103,733 from the Company in compensation in 2018.

23.     Defendant Stephen R. Davis ("Davis") has served as a member of the Board since July 2015.  Defendant Davis also served as Chairman of the Company's Audit Committee during the Relevant Period.  According to the Company's filings with the SEC, defendant Davis received $124,459 in compensation from the Company in 2018.

24.     Defendant Reid M. Huber ("Huber") has served as a member of the Company's Board since October 2014.  According to the Company's filings with the SEC, defendant Huber received $125,644 from the Company in compensation in 2018.

25.     Defendant Jon P. Stonehouse ("Stonehouse") has served as a member of the Company's Board since December 2014.  Defendant Stonehouse was a member of the Company's Audit Committee during the Relevant Period.  According to the Company's filings with the SEC, defendant Stonehouse received $128,793 in compensation from the Company in 2018.

26.     Defendant Frank B. McGuyer ("McGuyer") was a member of the Company's Board between March 2009 and December 2018.  Defendant McGuyer was a member of the Company's Audit Committee during the Relevant Period.  According to the Company's filings with the SEC, defendant McGuyer received $64,509 in compensation from the Company in 2018.

27.     Defendant Kevin M. Slawin ("Slawin") was a member of the Board between July 2004 and June 2017, Chief Technology Officer between February 2006 and December 2016, and

Chief Medical Officer between February 2006 and March 2015.  According to the Company's filings with the SEC, defendant Slawin received $336,347 from the Company in compensation in 2017.  During the Relevant Period, defendant Slawin sold the following shares with insider information regarding Bellicum's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Bellicum stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| July 15, 2015 | 6,000 | $20.00 | $120,000 |
| November 16, 2015 | 24,000 | $20.65 | $495,509 |
| April 22, 2016 | 55,000 | $11.43 | $628,498 |
| July 15, 2016 | 22,281 | $13.72 | $305,677 |
| July 18, 2016 | 2,719 | $13.99 | $38,044 |
| July 27, 2016 | 15,000 | $15.00 | $225,000 |
| August 15, 2016 | 37,000 | $19.31 | $1,293,943 |
| September 16, 2016 | 4,584 | $20.01 | $91,713 |
| September 21, 2016 | 23,416 | $20.12 | $471,088 |
| December 15, 2016 | 30,000 | $15.45 | $463,539 |
| February 7, 2017 | 30,000 | $12.54 | $376,215 |

28.     Defendants Farrell, Musso, and Moseley are sometimes referred to herein as the "Securities Class Action Defendants."

29.     Defendants Farrell, Brown, Daly, Davis, Huber, Stonehouse, McGuyer, and Slawin are sometimes referred to herein as the "Director Defendants."

30.     Defendants Farrell, Musso, Moseley, and Slawin, are sometimes referred to herein as the "Insider Selling Defendants."

31.     Defendants Brown, Davis, Stonehouse, and McGuyer are sometimes referred to herein as the "Audit Committee Defendants."

32.     Defendants Farrell, Musso, Moseley, Brown, Daly, Davis, Huber, Stonehouse, McGuyer, and Slawin are sometimes referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

36.     To discharge their duties, the officers and directors of Bellicum were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Bellicum were required to, among other things:

a. ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b. conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c. properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d. remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e. ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

37. Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

38. The Company also maintains a Code of Business Conduct and Ethics (the "Code"). The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Bellicum and its subsidiaries.

39.     According to the Code, the employees and directors of Bellicum are responsible for helping Bellicum maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom Bellicum does business.

40.     Pursuant to the Code:

Obeying the law, both in letter and in spirit, is the foundation of this Code.  Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities.  We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility.

*        *        *

The Company's business is subject to, or may in the future be subject to, a number of legal and regulatory requirements, including standards related to ethical procedures and proper scientific conduct.  We expect employees to comply with all such requirements.

*        *        *

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as governmental agencies.  In particular, we rely upon our accounting and other business and corporate records in preparing periodic and current reports that we file with the Securities and Exchange Commission ("SEC").  Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations.  Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures.  In addition:

• no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

• all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate

information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

\*     \*     \*

Employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business.  All non-public information about the Company or about companies with which we do business is considered confidential information.  To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when handling material inside information.

41.     In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities.   The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

42.     Pursuant to the Charter:

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Bellicum Pharmaceuticals, Inc. (the "Company") is to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, the systems of internal control over financial reporting, and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports and the qualifications, independence and performance of the firm or firms of certified public accountants engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attest services (the "Auditors").  The Committee shall also provide oversight assistance in connection with the Company's legal, regulatory and ethical compliance programs as established by management and the Board.  The operation of the Committee shall be subject to the Bylaws of the Company as in effect from time to time and Section 141 of the Delaware General Corporation Law.

\*     \*     \*

The Committee shall oversee the Company's financial reporting process on behalf of the Board, and shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address most effectively changing circumstances. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and processes with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or rules) deviate from these activities as appropriate under the circumstances:

\*       \*       \*

9. **Quarterly Results**. To review and discuss with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the Securities and Exchange Commission of the Company's Quarterly Report on Form 10-Q or Registration Statements, and any other matters required to be communicated to the Committee by the Auditors under generally accepted auditing standards, including standards of the Public Company Accounting Oversight Board (United States), as appropriate.

10. **Management's Discussion and Analysis**. To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports or Registration Statements to be filed with the Securities and Exchange Commission.

11. **Press Releases**. To review and discuss with management and the Auditors, as appropriate, earnings press releases, and press releases containing information relating to material financial developments and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions with respect to the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of such discussions.

12. **Accounting Principles and Policies**. To review and discuss with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("GAAP") related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, and significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements.

13. **Risk Assessment and Management**.  To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures; and to review and discuss with management insurance programs, including director and officer insurance, product liability insurance and general liability insurance (but excluding compensation and benefits related insurance).

\*      \*      \*

18. **Internal Control Over Financial Reporting**.  To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of internal control over financial reporting including significant deficiencies or material weaknesses identified by the Company's Auditors.  To review with management and the Auditors any fraud, whether or not material, that includes management or other employees who have any significant role in the Company's internal control over financial reporting and any significant changes in internal controls or other factors that could significantly affect internal controls, including any corrective actions in regard to significant deficiencies or material weaknesses.

\*      \*      \*

23. **Ethical Compliance; Compliance with Legal and Regulatory Requirements**.  To review reports from management and the Auditors regarding the adequacy and effectiveness of the Company's procedures to monitor and ensure compliance with its legal and regulatory responsibilities, including the Company's disclosure controls and procedures, as well as its Code, and regarding legal matters and compliance with legal and regulatory requirements that may have a material effect on the Company's business, financial statements or compliance policies, including any material reports or inquiries from regulatory or governmental agencies.

24. **Regulatory and Accounting Initiatives**.  To review with counsel, the Auditors, and/or management, as appropriate, any significant regulatory or other legal or accounting initiatives or matters that may have a material impact on the Company's financial statements, or compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

43.     In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such

controls over reporting.  The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

44.     In addition, as executive officers and directors of a publicly-traded company whose Common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Bellicum to make false and misleading statements of material fact about the Company's financials and about Bellicum's maintenance of adequate internal controls.

45.     Each of the Individual Defendants further owed to Bellicum and its stockholders the duty of loyalty requiring that each favor Bellicum's interest and that of its stockholders over their own while conducting the affairs the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

46.     Bellicum is a clinical stage biopharmaceutical company that focuses on discovering and developing novel cellular immunotherapies for various forms of cancer and other diseases. Per its SEC filings, the Company is "not profitable, ha[s] no products approved for commercial

sale and ha[s] incurred significant losses since…inception in 2004." The Company's lead clinical product candidate, BPX-501, now known as rivogenlecleucel or Rivo-cel, is described as an adjunct T-cell therapy administered after allogeneic hematopoietic stem cell transplantation ("HSCT"). Allogeneic HSCT is a procedure used to treat blood-related cancers by transferring healthy blood-forming stem cells from a healthy genetically similar donor to the patient.

47.     When a transplant is successful, the donor stem cells can replace stem cells in the bone marrow, potentially providing the only long-term cure of the patient's disease, but the procedure can result in serious and toxic complications. The stated role of BPX-501 is to improve the chances of transplant success, accelerate the recovery of the depleted immune system, and decrease infection and relapse rates, better than any alternative.

THE CLINICAL TRIALS

48.     Bellicum was subject to FDA rules and regulations and was required to obtain approval from the FDA to market and sell BPX-501 in the United States. The process for approval included three rounds of human clinical trials:  phase 1 clinical trials, phase 2 clinical trials, and phase 3 clinical trials.

49.     Phase 1 clinical trials are conducted in a small number of volunteers or patients to assess the early tolerability and safety profile, and the pattern of drug absorption, distribution, and metabolism.

50.     Phase 2 clinical trials are conducted in a limited patient population afflicted with a specific disease in order to assess appropriate dosages and dose regimens, expand evidence of the safety profile, and evaluate preliminary efficacy.

51.     Phase 3 clinical trials are larger scale, multicenter, and well-controlled and are conducted on patients with a specific disease to generate enough data to statistically evaluate the

efficacy and safety of the product for approval to establish the overall risk-benefit relationship of the drug and to provide adequate information for the labeling of the drug.

52. In addition to the 3 phases of clinical trials, sometimes, pharmaceutical companies would engage in post-approval clinical trials, sometimes referred to as Phase 4 clinical trials, which may be conducted after initial marketing approval by the FDA.

53. Pursuant to FDA regulations, the Company was required to notify the FDA within 15 days after learning of a "serious adverse drug experience," which includes any reaction that is fatal, life threatening, or requires in-patient hospitalization, or prolongs hospitalization.  If the serious adverse drug experience is an "unexpected" reaction, the Company was required to notify the FDA via telephone, facsimile transmission, or in writing within 7 calendar days of the receipt of that information, followed by a complete written report within 8 calendar days.

54. In 2014, Bellicum initiated BP-004, a phase 1/2 clinical trial, which included treating patients with BPX-501, in both European and U.S. pediatric transplant centers.  However, the BPX-501 clinical trial protocols had serious deficiencies as to the monitoring and managing of neurotoxicity and all related adverse events.  Due to the serious deficiencies, three pediatric patients treated with BPX-501 in the BP-004 trial suffered encephalopathy, a general term referring to brain disease, damage, or malfunction.  Each case of encephalopathy occurred in a different treatment center, and one of the three pediatric patients died.  These adverse events significantly raised the risk that the FDA would force the Company to cease conducting any BPX-501 studies until resolving the deficiencies.  The Company had a safety database for the clinical trials, which recorded adverse events within 24 hours of occurrence.

55. Nevertheless, the Individual Defendants touted their compliance with international Good Clinical Practices and the FDA's current Good Clinical Practices.  However, the Individual

Defendants failed to disclose to investors that the Company's prime candidate for FDA approval was experiencing clinical results that could potentially scrap the development of the drug altogether.

56.     The cases of encephalopathy in pediatric patients who were treated with BPX-501 were widely known at the Company, including high-level employees reporting directly to defendant Fair.  In connection with the cases of encephalopathy, the Company significantly slowed production of BPX-501.  Further, in mid-2017, defendant Moseley resigned from the Company as the COO and Executive Vice President of Clinical Development after having a leading role in the Company's clinical trials.  Also, in 2017, the Individual Defendants hired Dr. Paul Woodard ("Woodard") as the Company's Vice President of Clinical Development.  Woodard had previously published a study discussing HSCT, the procedure for which BPX-501 is designed.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS**

57.     Throughout the Relevant Period, the Individual Defendants issued false and/or misleading statements regarding the clinical program for BPX-501.

58.     On January 31, 2015, the Individual Defendants published a press released regarding the Company's successful dosing of BPX-501.  The press release contained a quote from defendant Farrell, which stated:

> We're pleased to have successfully launched a clinical program acceptable to U.S. and European regulatory agencies that allows us to include patients with blood cancers and up to 18 different non-malignant blood diseases under a single protocol. We believe BPX-501 may have the potential to make alternative donor haplo-identical stem cell transplants as routine as conventional transplants from matched donors, enabling a treatment known to be curative, and making it available for many more patients suffering from a wide range of deadly and lifelong diseases.

59.     Despite the fact that BPX-501 program's sub-standard protocol for monitoring and management of adverse events, the Individual Defendants stated that the clinical program was

acceptable to the FDA.  Thus, the above statement was materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

60.     The Individual Defendants continued to make positive statements regarding the BPX-501 despite the serious flaws in the BPX-501 clinical program.

**2014 Results and the 2014 10-K**

61.     On Mach 11, 2015, the Individual Defendants held a conference call with investors and analysts to discuss the Company's operating results for the Fourth Quarter of 2014 and fiscal 2014 annually.  During the call, defendant Farrell represented:

> So as we look to the remainder of 2015, pursuant to our strategy to pursue global regulatory approval and expand the potential addressable patient population for BPX-501, we intend to initiate additional Phase 1/2 clinical trials in different transplant settings in both the United States and Europe.

62.     On March 20, 2015, the Individual Defendants caused the Company to file a Form 10-K with the SEC (the "2014 10-K") containing the Company's operational and financial results for the fourth quarter of 2014 and 2014 annually.  As to the BPX-501, the 2014 10-K stated:

> We are currently conducting three Phase 1/2 clinical trials of BPX-501 at leading transplant centers in the United States and Europe:  BP-001, a clinical trial in adults in which BPX-501 is administered after initial allogeneic HSCT for hematological cancers, BP-003, a clinical trial in children with orphan inherited blood disorders in which BPX-501 is administered after initial allogeneic HSCT, and BP-004 an additional Phase 1/2 clinical trial in children with hematological cancers or orphan inherited blood disorders.  In addition, we are planning to initiate additional Phase 1/2 clinical trials in the United States and Europe in 2015, as part of our strategy to pursue a global regulatory approval and expand the potential addressable patient population for BPX-501.

*      *      *

In all cases, the clinical trials are conducted in accordance with GCP and the applicable regulatory requirements and the ethical principles that have their origin in the Declaration of Helsinki.

*      *      *

[W]e are responsible for ensuring that each of our studies is conducted in accordance with applicable protocol, legal, regulatory and scientific standards, and our reliance on third parties does not relieve us of our regulatory responsibilities. We and these third parties are required to comply with current good clinical practices, or cGCPs, which are regulations and guidelines enforced by the FDA and comparable foreign regulatory authorities for product candidates in clinical development.

63.     Despite the fact that the Company's BPX-501 clinical program suffered severe flaws in monitoring and managing adverse, the Individual Defendants represented that the trials followed good clinical practices.

64.     Thus, the above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that: (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

65.     Defendants Farrell and Musso, specifically, signed the Sarbanes-Oxley Act ("SOX") Certifications in the 2014 10-K and represented that:

1. I have reviewed this Annual Report on Form 10-K of Bellicum Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

20

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

66.     Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

**1Q2015 Results and the 1Q2015 10-Q**

67.     On May 12, 2015, the Individual Defendants caused the Company to file a Form 10-Q (the "1Q2015 10-Q") disclosing the financial and operational results of the first quarter of 2015, which stated that:

> We are a clinical stage biopharmaceutical company focused on discovering and developing novel cellular immunotherapies for various forms of cancer, including both hematological cancers and solid tumors, as well as orphan inherited blood disorders.  We are using our proprietary Chemical Induction of Dimerization, or CID, technology platform to engineer and then control components of the immune system in real time.  By incorporating our CID platform, our product candidates may offer better safety and efficacy outcomes than are seen with current cellular immunotherapies.
>
> We are developing next-generation product candidates in some of the most important areas of cellular immunotherapy, including hematopoietic stem cell transplantation, or HSCT, CAR T cell therapy, and dendritic cell vaccines.  By incorporating our novel switch technologies, we are developing product candidates with the potential to elicit positive clinical outcomes and ultimately change the treatment paradigm in various areas of cellular immunotherapy.  Our clinical product candidates, each of which is a combination product of genetically modified immune cells and rimiducid, are described below.
>
> • BPX-501.  We are developing a CaspaCIDe product candidate, BPX-501, as an adjunct T-cell therapy administered after allogeneic HSCT, using donor stem cells.  BPX-501 is designed to decrease the risk of including T cells with the transplant by enabling the elimination of donor T cells through the triggering of the CaspaCIDe safety switch upon emergence of graft-versus-host-disease, or GvHD. BPX-501 is currently being evaluated in multiple Phase 1/2 clinical trials in the United States and Europe, with the first top-line data expected in the fourth quarter of 2015.

68.     Nevertheless, the above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

69.     Further, the 1Q2015 10-Q included SOX Certifications signed by defendants Farrell and Musso that contained representations substantially similar to the representations contained in the 2014 10-K. Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

**2Q2015 Results and the 2Q2015 10-Q**

70.     On August 13, 2015, the Individual Defendants caused the Company to file a Form 10-Q (the "2Q2015 10-Q") disclosing the financial and operational results of the second quarter of 2015, which stated that:

> We are a clinical stage biopharmaceutical company focused on discovering and developing novel cellular immunotherapies for various forms of cancer, including both hematological cancers and solid tumors, as well as orphan inherited blood disorders.  We are using our proprietary Chemical Induction of Dimerization, or CID, technology platform to engineer and then control components of the immune system in real time.  By incorporating our CID platform, our product candidates may offer better safety and efficacy outcomes than are seen with current cellular immunotherapies.
>
> We are developing next-generation product candidates in some of the most important areas of cellular immunotherapy, including hematopoietic stem cell transplantation, or HSCT, CAR T cell therapy, and dendritic cell vaccines.  By incorporating our novel switch technologies, we are developing product candidates with the potential to elicit positive clinical outcomes and ultimately change the treatment paradigm in various areas of cellular immunotherapy.  Our clinical product candidates, each of which is a combination product of genetically modified immune cells and rimiducid, are described below.
>
> - BPX-501.  We are developing a CaspaCIDe product candidate, BPX-501, as an adjunct T-cell therapy administered after allogeneic HSCT, using donor stem cells.  BPX-501 is designed to decrease the risk of including T cells with the transplant by enabling the elimination of donor T cells through the triggering of the CaspaCIDe safety switch upon emergence of graft-versus-host-disease, or GvHD.  BPX-501 is currently being evaluated in multiple Phase 1/2 clinical trials in the United States and Europe, with the first top-line data expected in the fourth quarter of 2015.

71.     In connection with the 2Q2015 10-Q, on August 13, 2015, the Individual

Defendants released a press release, which quoted defendant Farrell as stating:

> In our lead BPX-501 clinical program, we have been pleased with the strong pace
> of patient recruitment into our BP-004 study.  This study is evaluating pediatric
> patients with orphan genetic diseases or hematological cancers who undergo a
> haploidentical allogeneic hematopoietic stem cell transplant to attain a disease cure.
> We are assessing safety and the recovery of the immune system, and remain on
> track to present initial topline results from approximately 40 patients in December
> of this year.  BPX-501 is designed to address the clear medical need for a safer,
> more effective transplant option for patients who do not have a matched donor.

72.     Additionally, on August 13, 2015, the Individual Defendants held a conference call

with investors and analysts to discuss the operational and financial results of the Company for the

second quarter of 2015.  During the Call, defendant Moseley stated:

> I'd like to take a step back and talk about the goals of our BPX-501 program and
> what we're looking for in terms of safety and efficacy.

> *        *        *

> To address these issues in the haplo setting, we've developed BPX-501, an adjunct
> cellular therapy of genetically modified T cells which incorporate our proprietary
> clinically validated CaspaCIDe safety switch.  The product is designed to provide
> a safety net so that physicians can perform haplo stem cell transplants, and add back
> the important T cells to speed immune reconstitution and control infections.

73.     Adding to defendant Moseley's statement regarding the BPX-501 program,

defendant Musso stated, "[W]e believe BPX-501 could make a therapy known to be curative, safer,

more effective and available for many more patients with a wide range of lifelong and deadly

diseases."

74.     Nevertheless, the above statements were materially false and/or misleading at the

time they were made because the Individual Defendants failed to disclose to investors that:  (i)

patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the

Company's clinical trial procedures and protocols had a deficiency in their monitoring and

management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

75.     Further, the 3Q2015 10-Q included SOX Certifications signed by defendants Farrell and Musso that contained representations substantially similar to the representations contained in the 2014 10-K.  Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

**3Q2015 Results and the 3Q2015 10-Q**

76.     On November 9, 2015, the Individual Defendants caused the Company to file a Form 10-Q (the "3Q2015 10-Q") disclosing the financial and operational results of the third quarter of 2015, which stated that:

> We are a clinical stage biopharmaceutical company focused on discovering and developing novel cellular immunotherapies for various forms of cancer, including both hematological cancers and solid tumors, as well as orphan inherited blood disorders.  We are using our proprietary Chemical Induction of Dimerization, or CID, technology platform to engineer and then control components of the immune system in real time.  By incorporating our CID platform, our product candidates may offer better safety and efficacy outcomes than are seen with current cellular immunotherapies.
>
> We are developing next-generation product candidates in some of the most important areas of cellular immunotherapy, including hematopoietic stem cell transplantation, or HSCT, chimeric antigen receptor T cell therapy (CAR-Ts), and T cell receptors (TCRs).  HSCT, also known as bone marrow transplantation, has for decades been curative for many patients with hematological cancers or orphan inherited blood disorders.  However, adoption of HSCT to date has been limited by the risks of transplant-related morbidity and mortality from graft-versus-host-disease, or GvHD, and the potential for serious infections due to the lack of an effective immune system following a transplant. CAR-T and TCR cell therapies are an innovative approach in which a patient's T cells are genetically modified to carry chimeric antigen receptors (CARs) or T cell receptors (TCRs) which redirect the T cells against cancer cells.  While high objective response rates have been reported in some hematological malignancies, serious and sometimes fatal toxicities have

arisen in patients treated with CAR-T cell therapies. These toxicities include instances in which the CAR-T cells have caused high levels of cytokines due to over-activation, referred to as "cytokine release syndrome", frequent transient neurologic toxicities and cases in which they have attacked healthy organs as well as the targeted tumor, sometimes resulting in death. In solid tumors, where the behavior of CAR-T cells is particularly unpredictable and results have been inconsistent, researchers are developing enhanced CAR-T cell approaches called "armored CARs" that raise even greater safety concerns.

Our proprietary CID platform is designed to address these challenges. Events inside a cell are controlled by cascades of specialized signaling proteins. CID consists of molecular switches, modified forms of these signaling proteins, which are triggered inside the patient by infusion of a small molecule, rimiducid, instead of by natural upstream signals. We include these molecular switches in the appropriate immune cells and deliver the cells to the patient in the manner of conventional cellular immunotherapy. We have developed two such switches: a "safety switch," designed to initiate programmed cell death, or apoptosis, of the immunotherapy cells, and an "activation switch," designed to stimulate activation and in some cases proliferation of the immunotherapy cells. Each of our technologies incorporates one of these switches, for enhanced, real time control of safety and efficacy:

- CaspaCIDe is our safety switch, incorporated into our HSCT and in certain of our CAR-T or TCR, product candidates, where it is inactive unless the patient experiences a serious side effect. In that event, rimiducid is administered to fully or partially eliminate the cells, with the goal of terminating or attenuating the therapy and resolving the serious side effect.

- CIDeCAR consists of CAR-T cells modified to include the signaling domains of two proteins, MyD88 and CD40. Together, these form our proprietary dual co-stimulatory domain, MC, which is designed to activate T cells in the presence of cancer cells. Incorporation of CaspaCIDe in a CIDeCAR product candidate is intended to allow the enhanced potency of MC co-stimulation to be deployed safely in patients.

- GoCAR-T consists of CAR-T cells that are modified to include the proprietary dual co-stimulatory domain, MC. In contrast to CIDeCAR, MC is structured in GoCAR-T as a rimiducid-driven molecular switch, separate from the chimeric antigen receptor. GoCAR-T is designed to allow control of the activation and proliferation of the CAR-T cells through the scheduled administration of a course of rimiducid infusions that may continue until the desired patient outcome is achieved. In the event of emergence of side effects, the level of activation of the GoCAR-T cells is designed to be attenuated by extending the interval between rimiducid doses and/or reducing the dosage per infusion.

By incorporating our novel switch technologies, we are developing product candidates with the potential to elicit positive clinical outcomes and ultimately change the treatment paradigm in various areas of cellular immunotherapy.  Our lead clinical product candidate is described below:

- BPX-501.  We are developing a CaspaCIDe product candidate, BPX-501, as an adjunct T-cell therapy administered after allogeneic hematopoietic stem cell transplant (HSCT).  BPX-501 is designed to improve transplant outcomes by enhancing the recovery of the immune system following an HSCT procedure.  BPX-501 addresses the risk of infusing donor T cells by enabling the elimination of donor T cells through the activation of the CaspaCIDe safety switch if there is an emergence of graft-versus-host-disease (GvHD).  BPX-501 is currently being evaluated in multiple Phase 1/2 clinical trials in the United States and Europe, with the initial top-line data from ongoing studies expected to be disclosed in conjunction with the Annual Meeting of the American Society of Hematology in December 2015.

77.     As discussed in the 3Q2015, the Company participated in the Annual Meeting of the American Society of Hematology on December 5, 2015.  During the annual meeting, defendant Moseley represented:

Conclusions:  Overall, these data indicate that the infusion of BPX-501 cells is safe and well tolerated.  The 100-day CI of skin-only grade I-II acute GvHD observed in these patients is similar to that of children included in the previous trial of haplo-HSCT after depletion of α/β T cells.  BPX-501 cells expand in vivo and persist over time, potentially contributing to accelerate the recovery of adaptive T-cell immunity, with improved clinical outcome.  The iC9 cell-suicide system may increase the implementation of cellular therapy approaches aimed at optimizing immune recovery after transplantation.

78.     Nevertheless, the above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

79.     Further, the 3Q2015 10-Q included SOX Certifications signed by defendants Farrell and Musso that contained representations substantially similar to the representations contained in the 2014 10-K.  Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

**2015 Results and the 2015 10-K**

80.     On March 14, 2016, the Individual Defendants caused the Company to file a Form 10-K (the "2015 10-K") disclosing the financial and operational results for the fourth quarter of 2015 and 2015 annually.  The 2015 10-K stated:

We are a clinical stage biopharmaceutical company focused on discovering and developing novel cellular immunotherapies for various forms of cancer, including both hematological cancers and solid tumors, as well as orphan inherited blood disorders.  Cellular immunotherapy has the potential to transform medicine by harnessing immune cells, principally T cells, to attack and eliminate harmful diseased cells in the body.  Unlike traditional small molecule and biologic therapies, which are predictably metabolized and eliminated from the body, cellular immunotherapies are unpredictable and uncontrollable.  We are using our proprietary Chemical Induction of Dimerization, or CID, technology platform to engineer and then control components of the immune system.  By incorporating our CID platform, our product candidates may offer better safety and efficacy outcomes than are seen with current cellular immunotherapies.

We are developing next-generation product candidates in some of the most important areas of cellular immunotherapy, including hematopoietic stem cell transplantation, or HSCT, and CAR T and TCR cell therapies.  HSCT, also known as bone marrow transplantation, can be a curative treatment, and is standard of care for a wide range of life-long and deadly diseases.  However, the majority of patients that could benefit from HCST do not get the procedure because a compatible, or fully "matched" donor cannot be located.  By contrast, a haploidentical, or "partial match" donor, such as a parent, sibling or child, can almost always be identified.  To date, haplo-transplant procedures have not been widely adopted due to heightened risks of the procedure.  Specifically, if T cells, which are important for rebuilding immunity and infection control, are included in the haplo-transplant graft, the patient will be at risk of developing Graft versus Host Disease, or GvHD, an often deadly reaction in which some of the mismatched T cells attack the

patient's liver, skin, mucosa and gastro-intestinal tract.  For that reason, a haplo-transplant is either avoided, which has historically been the case, or if it is performed, the T cells are first depleted from the graft.  A T-depleted transplant lowers the risk of GvHD, but morbidity and mortality rates increase as a result of infections, slow engraftment and delayed immune recovery due to the lack of T cells.  To address these issues, we developed BPX-501 as an adjunct T cell therapy of genetically modified donor T cells incorporating our proprietary CaspaCIDe safety switch.  The product candidate is designed to provide a safety net to eliminate the alloreactive T cells should GvHD occur, enabling physicians to perform haploidentical stem cell transplants and add back the BPX-501 genetically engineered T cells to speed immune reconstitution and provide control over infections.

Adoptive T cell therapy is an innovative approach in which a patient's T cells are genetically modified to carry either chimeric antigen receptors, or CARs, or T cell receptors, or TCRs, which redirect the T cells against cancer cells.  While high objective response rates have been reported in some hematological malignancies, serious and sometimes fatal toxicities have arisen in patients treated with CAR T and TCR cell therapies.  These toxicities include instances in which the cells have caused high levels of cytokines due to over-activation, referred to as "cytokine release syndrome", frequent transient neurologic toxicities and cases in which they have attacked healthy organs instead of the targeted tumor, leading to death.  In solid tumors, where the behavior of CAR T and TCR cells is particularly unpredictable and results have been inconsistent, researchers are developing enhanced approaches to attain efficacy, such as "armored CARs" that raise even greater safety concerns.

Our proprietary CID platform is designed to address these challenges.  Events inside a cell are controlled by cascades of specialized signaling proteins.  CID consists of molecular switches, modified forms of these signaling proteins, which are triggered inside the patient by infusion of a small molecule, rimiducid, instead of by natural upstream signals.  We include these molecular switches in the appropriate immune cells and deliver the cells to the patient in the manner of conventional cellular immunotherapy.  We have developed two such switches: a "safety switch," designed to initiate programmed cell death, or apoptosis, of the immunotherapy cells, and an "activation switch," designed to stimulate activation and in some cases proliferation of the immunotherapy cells.  Each of our technologies incorporates one of these switches, for enhanced, control of safety and efficacy:

- CaspaCIDe is our safety switch, incorporated into our HSCT and T-cell receptor, or TCR, product candidates, where it is inactive unless the patient experiences a serious side effect.  In that event, rimiducid is administered to fully or partially eliminate the cells, with the goal of terminating or attenuating the therapy and resolving the serious side effect.

- CIDeCAR consists of CAR T cells modified to include our CaspaCIDe safety switch and in which the CAR T cell incorporates the signaling domains of two proteins, MyD88 and CD40.  Together, these form our proprietary dual co-stimulatory domain, MC, which is designed to activate T cells more potently than co-stimulatory molecules CD28 and 4-1BB, which are used in most investigational CAR T cell therapies.  Incorporation of CaspaCIDe in a CIDeCAR product candidate is intended to allow the potential enhanced potency of MC co-stimulation to be deployed safely in patients.

- GoCAR-T consists of CAR T cells that are modified to include the proprietary dual co-stimulatory domain, MC.  In contrast to CIDeCAR, MC is structured in GoCAR-T as a molecular switch, separate from the chimeric antigen receptor, which itself contains no co-stimulatory domains.  GoCAR-T is designed to allow control of the activation and proliferation of the CAR T cells through the scheduled administration of a course of rimiducid infusions that may continue until the desired patient outcome is achieved. In the event of emergence of side effects, the level of activation of the GoCAR-T cells is designed to be attenuated by extending the interval between rimiducid doses and/or reducing the dosage per infusion.

By incorporating our novel switch technologies, we are developing product candidates with the potential to elicit positive clinical outcomes and ultimately change the treatment paradigm in various areas of cellular immunotherapy.  Our clinical product candidates; each of which is a combination product of genetically modified immune cells and rimiducid, are described below.

- BPX-501.  Our lead product candidate, BPX-501, is an adjunct T cell therapy administered after allogeneic HSCT using genetically modified donor T cells incorporating the CaspaCIDe® safety switch.  BPX-501 is currently being evaluated in multiple Phase 1/2 clinical trials in adults and pediatric patients with leukemias, lymphomas, and genetic blood diseases in the U.S. and Europe.  We believe that BPX-501 could enable physicians to maximize the benefits of T cell therapy for allogeneic HSCT, such as immune system reconstitution, prevention or treatment of relapse of underlying disease and improvement in stem cell engraftment, while mitigating some of the safety issues, such as high grade GvHD, associated with a stem cell transplant.  BPX-501 is currently being evaluated in multiple Phase 1/2 clinical trials in the United States and Europe to assess whether BPX-501 T cells from haplo-identical donors administered following HCST are safe and can help speed immune reconstitution.  In December 2015, interim data from the lead site in the ongoing BP-004 Phase 1/2 clinical trial was presented at the 57th Annual Meeting of the American Society of Hematology, or ASH.  Pediatric patients in the study with a variety of genetic diseases achieved disease-free outcomes from a haploidentical T cell-depleted hematopoietic stem cell transplant, followed by an add-back of BPX-501 donor T cells.  We are making preparations for dialogue with regulators in Europe and the U.S., expected to occur in the second

quarter of 2016, with the goal of defining the path to regulatory approval initially for non-malignant pediatric diseases.  Additionally, BPX-501 clinical trials in different transplant settings are ongoing, in which we are accumulating longer-term data to assess relevant clinical outcomes in malignant disease settings.  The FDA has granted orphan drug designation for the combination of BPX-501 genetically modified T cells and activator agent rimiducid as "replacement T-cell therapy for the treatment of immunodeficiency and GvHD after allogenic hematopoietic stem cell transplant."

81.   In connection with the results for the fourth quarter of 2015 and 2015 annually, the Individual Defendants held a conference call with investors and analysts on March 14, 2016. During the call, defendant Farrell represented:

We believe our cell therapies have disruptive potential with the unique safety and efficacy benefits.  As you know, we recently met with the National Institutes of Health Recombinant DNA Advisory Committee which reviewed product candidates involving gene transfer about the BPX-501 and BPX-601 protocols.  We believe the meetings went well and are moving forward with our plan to file IND with the FDA for these product candidates.

*        *        *

We look forward to meeting with regulators in Europe and the US in the second quarter with the goal of defining the path to regulatory filing and approval initially in non-malignant pediatric genetic diseases.

82.   In addition to the announcement of the results for the fourth quarter of 2015, on April 5, 2016, the Individual Defendants published a press release, which quoted defendant Farrell as stating:

In both malignant and nonmalignant patients, the results show that treatment with BPX-501 appears safe, well-tolerated, and provides important immune benefits," commented Tom Farrell, President and CEO of Bellicum Pharmaceuticals.  "These data also demonstrate high BPX-501 cell viability, expansion and persistence, and that the improvement of immune reconstitution is sustained.  We look forward to sharing more results as these data mature, and providing updates following our plan to meet with the U.S.  FDA and EMA during the second quarter of this year.

83.   Nevertheless, the above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the

Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

84.     Further, the 2015 10-K included SOX Certifications signed by defendants Farrell and Musso that contained representations substantially similar to the representations contained in the 2014 10-K.  Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

**1Q2016 Results and the 1Q2016 10-Q**

85.     On May 9, 2016, the Individual Defendants caused the Company to file a Form 10-Q with the SEC (the "1Q2016 10-Q") disclosing the financial and operational results for the first quarter of 2016.  The 1Q2016 10-Q stated:

> We are a clinical stage biopharmaceutical company focused on discovering and developing novel cellular immunotherapies for various forms of cancer, including both hematological cancers and solid tumors, as well as orphan inherited blood disorders.  We are using our proprietary Chemical Induction of Dimerization, or CID, technology platform to engineer and then control components of the immune system in real time.  By incorporating our CID platform, our product candidates may offer better safety and efficacy outcomes than are seen with current cellular immunotherapies.
>
> We are developing next-generation product candidates in some of the most important areas of cellular immunotherapy, including hematopoietic stem cell transplantation, or HSCT, chimeric antigen receptor T cell therapy, or CAR-Ts, and T cell receptors, or TCRs. HSCT, also known as bone marrow transplantation, has for decades been curative for many patients with hematological cancers or orphan inherited blood disorders.  However, adoption of HSCT to date has been limited by the risks of transplant-related morbidity and mortality from graft-versus-host-disease, or GvHD, and the potential for serious infections due to the lack of an effective immune system following a transplant. CAR-T and TCR cell therapies are an innovative approach in which a patient's T cells are genetically modified to carry chimeric antigen receptors, or CARs, or TCRs which redirect the T cells against cancer cells.  While high objective response rates have been reported in some hematological malignancies, serious and sometimes fatal toxicities have arisen in

patients treated with CAR-T cell therapies. These toxicities include instances in which the CAR-T cells have caused high levels of cytokines due to over-activation, referred to as "cytokine release syndrome", frequent transient neurologic toxicities and cases in which they have attacked healthy organs as well as the targeted tumor, sometimes resulting in death. In solid tumors, where the behavior of CAR-T cells is particularly unpredictable and results have been inconsistent, researchers are developing enhanced CAR-T cell approaches called "armored CARs" that raise even greater safety concerns.

Our proprietary CID platform is designed to address these challenges. Events inside a cell are controlled by cascades of specialized signaling proteins. CID consists of molecular switches, modified forms of these signaling proteins, which are triggered inside the patient by infusion of a small molecule, rimiducid, instead of by natural upstream signals. We include these molecular switches in the appropriate immune cells and deliver the cells to the patient in the manner of conventional cellular immunotherapy. We have developed two such switches: a "safety switch," designed to initiate programmed cell death, or apoptosis, of the immunotherapy cells, and an "activation switch," designed to stimulate activation and in some cases proliferation of the immunotherapy cells. Each of our technologies incorporates one of these switches, for enhanced, real time control of safety and efficacy:

- CaspaCIDe is our safety switch, incorporated into our HSCT and T-cell receptor, or TCR, product candidates, where it is inactive unless the patient experiences a serious side effect. In that event, rimiducid is administered to fully or partially eliminate the cells, with the goal of terminating or attenuating the therapy and resolving the serious side effect.

- CIDeCAR consists of CAR T cells modified to include our CaspaCIDe safety switch and in which the CAR T cell incorporates the signaling domains of two proteins, MyD88 and CD40. Together, these form our proprietary dual co-stimulatory domain, MC, which is designed to activate T cells more potently than co-stimulatory molecules CD28 and 4-1BB, which are used in most investigational CAR T cell therapies. Incorporation of CaspaCIDe in a CIDeCAR product candidate is intended to allow the potential enhanced potency of MC co-stimulation to be deployed safely in patients.

- GoCAR-T consists of CAR T cells that are modified to include the proprietary dual co-stimulatory domain, MC. In contrast to CIDeCAR, MC is structured in GoCAR-T as a molecular switch, separate from the chimeric antigen receptor, which itself contains no co-stimulatory domains. GoCAR-T is designed to allow control of the activation and proliferation of the CAR T cells through the scheduled administration of a course of rimiducid infusions that may continue until the desired patient outcome is achieved. In the event of emergence of side effects, the level of activation of the GoCAR-T cells is designed to be attenuated

33

by extending the interval between rimiducid doses and/or reducing the dosage per infusion.

By incorporating our novel switch technologies, we are developing product candidates with the potential to elicit positive clinical outcomes and ultimately change the treatment paradigm in various areas of cellular immunotherapy.  Our clinical product candidates; each of which is a combination product of genetically modified immune cells and rimiducid, are described below.

- BPX-501.  We are developing a CaspaCIDe product candidate, BPX-501, as an adjunct T-cell therapy administered after allogeneic HSCT.  BPX-501 is designed to improve transplant outcomes by enhancing the recovery of the immune system following an HSCT procedure.  BPX-501 addresses the risk of infusing donor T cells by enabling the elimination of donor T cells through the activation of the CaspaCIDe safety switch if there is an emergence of uncontrolled GvHD.

86.     In connection with the results for the first quarter of 2016, the Individual Defendants published a press release on May 9, 2016, which highlighted that the Company was "[p]reparing to meet with the European Medicines Agency and U.S. FDA, with the goal of defining the path to regulatory filing and approval."

87.     Additionally, on June 11, 2016, the Company participated in the 21st Congress of the European Hematology Association, where defendant Moseley represented, "These data indicate that the infusion of BPX-501 cells in children with acute leukemia given selectively manipulated haploHSCT results in the absence of transplantation-related mortality . . . ."

88.     Nevertheless, the above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

89.     Further, the 1Q2016 10-Q included SOX Certifications signed by defendants Farrell and Musso that contained representations substantially similar to the representations contained in the 2014 10-K.  Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

**2Q2016 and the 2Q2016 10-Q**

90.     On August 8, 2016, the Individual Defendants caused the Company to file a Form 10-Q (the "2Q2016 10-Q") disclosing the Company's financial and operational results for the second quarter of 2016.  The 2Q2016 10-Q stated:

> We are a clinical stage biopharmaceutical company focused on discovering and developing novel cellular immunotherapies for various forms of cancer, including both hematological cancers and solid tumors, as well as orphan inherited blood disorders.  We are using our proprietary Chemical Induction of Dimerization, or CID, technology platform to engineer our product candidates with switch technologies that can control components of the immune system in real time.  By incorporating our CID platform, our product candidates may offer better safety and efficacy outcomes than are seen with current cellular immunotherapies.
>
> We are developing next-generation product candidates in some of the most important areas of cellular immunotherapy, including hematopoietic stem cell transplantation, or HSCT, chimeric antigen receptor T cell therapy, or CAR Ts, and T cell receptors, or TCRs. HSCT, also known as bone marrow transplantation, has for decades been curative for many patients with hematological cancers or orphan inherited blood disorders.  However, adoption of HSCT to date has been limited by the risks of transplant-related morbidity and mortality from graft-versus-host-disease, or GvHD, and the potential for serious infections due to the lack of an effective immune system following a transplant.  CAR T and TCR cell therapies are an innovative approach in which a patient's T cells are genetically modified to carry chimeric antigen receptors, or CARs, or TCRs which redirect the T cells against cancer cells.  While high objective response rates have been reported in some hematological malignancies, serious and sometimes fatal toxicities have arisen in patients treated with CAR T cell therapies.  These toxicities include instances in which the CAR T cells have caused high levels of cytokines due to over-activation, referred to as "cytokine release syndrome", neurologic toxicities and cases in which they have attacked healthy organs.  In each case, these toxicities

have sometimes resulted in death. In solid tumors, where the behavior of CAR T cells is particularly unpredictable and results have been inconsistent, researchers are developing enhanced CAR T cell approaches called "armored CARs" that raise even greater safety concerns.

Our proprietary CID platform is designed to address these challenges. Events inside a cell are controlled by cascades of specialized signaling proteins. CID consists of molecular switches, modified forms of these signaling proteins, which are triggered inside the patient by infusion of a small molecule, rimiducid, instead of by natural upstream signals. We include these molecular switches in the appropriate immune cells and deliver the cells to the patient in the manner of conventional cellular immunotherapy. We have developed two such switches: a "safety switch," designed to initiate programmed cell death, or apoptosis, of the immunotherapy cells, and an "activation switch," designed to stimulate activation and in some cases proliferation and/or persistence of the immunotherapy cells. Each of our product candidates incorporates one of these switches, for enhanced, real time control of safety and efficacy:

- CaspaCIDe is our safety switch, incorporated into our HSCT, and in certain of our TCR, product candidates, where it is inactive unless the patient experiences a serious side effect. In that event, rimiducid is administered to fully or partially eliminate the cells, with the goal of terminating or attenuating the therapy and resolving the serious side effect.

- Our "Go" switch incorporated into our GoCAR T product candidates is designed to allow control of the activation and proliferation of the T cells through the scheduled administration of a course of rimiducid infusions that may continue until the desired patient outcome is achieved. In the event of emergence of side effects, the level of activation of the GoCAR T cells is designed to be attenuated by extending the interval between rimiducid doses, reducing the dosage per infusion, or suspending further rimiducid administration.

By incorporating our novel switch technologies, we are developing product candidates with the potential to elicit positive clinical outcomes and ultimately change the treatment paradigm in various areas of cellular immunotherapy. Our lead clinical product candidate is described below.

- **BPX-501.** We are developing a CaspaCIDe product candidate, BPX-501, as an adjunct T cell therapy administered after allogeneic HSCT. BPX-501 is designed to improve transplant outcomes by enhancing the recovery of the immune system following an HSCT procedure. BPX-501 addresses the risk of infusing donor T cells by enabling the elimination of donor T cells through the activation of the CaspaCIDe safety switch if there is an emergence of uncontrolled GvHD.

91.     In connection with the results for the second quarter of 2016, the Individual Defendants held a conference call with investors and analysts on August 8, 2016.  During the call, defendant Farrell stated:

> We are pleased with the progress we have made toward defining an expedient pathway to the potential approval of BPX-501 and rimiducid for pediatric transplant patients in Europe.  We're now initiating discussions with the FDA and expect to be able to provide additional guidance on the approval pathways in both markets during the fourth quarter.
>
> *        *        *
>
> No.  Our most recent interactions have been around BPX-601 and 701.  I think our observation would be that they are being careful in their review, they appear to be applying some sort of consistent thinking, two novel constructs coming through their office, but I don't think we've seen anything that we could say was explicitly tied to specific recent circumstances.

92.     Nevertheless, the above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

93.     Further, the 2Q2016 10-Q included SOX Certifications signed by defendants Farrell and Musso that contained representations substantially similar to the representations contained in the 2014 10-K.  Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

**3Q2016 Results and the 3Q2016 10-Q**

94.     On November 9, 2016, the Individual Defendants caused the Company to file a

Form 10-Q (the "3Q2016 10-Q") disclosing the Company's financial and operational results for

the second quarter of 2016.  The 3Q2016 10-Q stated:

> We are a clinical stage biopharmaceutical company focused on discovering and developing novel cellular immunotherapies for various forms of cancer, including both hematological cancers and solid tumors, as well as orphan inherited blood disorders.  We are using our proprietary Chemical Induction of Dimerization, or CID, technology platform to engineer our product candidates with switch technologies that can control components of the immune system in real time.  By incorporating our CID platform, our product candidates may offer better safety and efficacy outcomes than are seen with current cellular immunotherapies.
>
> We are developing next-generation product candidates in some of the most important areas of cellular immunotherapy, including hematopoietic stem cell transplantation, or HSCT, chimeric antigen receptor T cell therapy, or CAR Ts, and T cell receptors, or TCRs.  HSCT, also known as bone marrow transplantation, has for decades been curative for many patients with hematological cancers or orphan inherited blood disorders.  However, adoption of HSCT to date has been limited by the risks of transplant-related morbidity and mortality from graft-versus-host-disease, or GvHD, and the potential for serious infections due to the lack of an effective immune system following a transplant.  CAR T and TCR cell therapies are an innovative approach in which a patient's T cells are genetically modified to carry chimeric antigen receptors, or CARs, or TCRs which redirect the T cells against cancer cells.  While high objective response rates have been reported in some hematological malignancies, serious and sometimes fatal toxicities have arisen in patients treated with CAR T cell therapies.  These toxicities include instances in which the CAR T cells have caused high levels of cytokines due to over-activation, referred to as "cytokine release syndrome", neurologic toxicities and cases in which they have attacked healthy organs.  In each case, these toxicities have sometimes resulted in death.  In solid tumors, where the behavior of CAR T cells is particularly unpredictable and results have been inconsistent, researchers are developing enhanced CAR T cell approaches called "armored CARs" that raise even greater safety concerns.
>
> Our proprietary CID platform is designed to address these challenges.  Events inside a cell are controlled by cascades of specialized signaling proteins.  CID consists of molecular switches, modified forms of these signaling proteins, which are triggered inside the patient by infusion of a small molecule, rimiducid, instead of by natural upstream signals.  We include these molecular switches in the appropriate immune cells and deliver the cells to the patient in the manner of conventional cellular immunotherapy.  We have developed two such switches: a

"safety switch," designed to initiate programmed cell death, or apoptosis, of the immunotherapy cells, and an "activation switch," designed to stimulate activation and in some cases proliferation and/or persistence of the immunotherapy cells. Each of our product candidates incorporates one of these switches, for enhanced, real time control of safety and efficacy:

- CaspaCIDe is our safety switch, incorporated into our HSCT, and in certain of our TCR, product candidates, where it is inactive unless the patient experiences a serious side effect.  In that event, rimiducid is administered to fully or partially eliminate the cells, with the goal of terminating or attenuating the therapy and resolving the serious side effect.

- Our "Go" switch incorporated into our GoCAR T product candidates is designed to allow control of the activation and proliferation of the T cells through the scheduled administration of a course of rimiducid infusions that may continue until the desired patient outcome is achieved.  In the event of emergence of side effects, the level of activation of the GoCAR T cells is designed to be attenuated by extending the interval between rimiducid doses, reducing the dosage per infusion, or suspending further rimiducid administration.

By incorporating our novel switch technologies, we are developing product candidates with the potential to elicit positive clinical outcomes and ultimately change the treatment paradigm in various areas of cellular immunotherapy.  Our lead clinical product candidate is described below.

- BPX-501.  We are developing a CaspaCIDe product candidate, BPX-501, as an adjunct T cell therapy administered after allogeneic HSCT.  BPX-501 is designed to improve transplant outcomes by enhancing the recovery of the immune system following an HSCT procedure.  BPX-501 addresses the risk of infusing donor T cells by enabling the elimination of donor T cells through the activation of the CaspaCIDe safety switch if there is an emergence of uncontrolled GvHD.

95.     Additionally, as to the regulatory approval process, the 3Q2016 10-Q stated:

Discussions are ongoing with European Medicines Agency (EMA) and the FDA in regards to approval requirements for BPX-501 and rimiducid.  Details regarding specific study endpoints and the data analysis plan are being refined in a formal protocol assistance process with EMA.  The Company has also initiated dialogue with the FDA to define a U.S. regulatory pathway.  We expect to have guidance from EMA by year end, and anticipate that the FDA regulatory interactions will continue into 2017.

96.     In addition to the third quarter results, the Company participated in the 58th American Society of Hematology Annual Meeting on December 3, 2016.  The presentation at the annual meeting stated:

> Conclusions:  Children with hemoglobinopathies and DBA can benefit from curative haplo-HSCT after depletion of $\alpha/\beta$ T-cells followed by infusion of BPX-501 cells, which, expanding and persisting over time, contribute to speed immune recovery of adaptive T-cell immunity, thus rendering the procedure safer.

97.     Also, the Individual Defendants published a press release on December 5, 2016 where the Company discussed the annual meeting and stated that the Company "continues to discuss the regulatory path to approval in the U.S. with FDA . . . ."

98.     Nevertheless, the above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

99.     Further, the 3Q2016 10-Q included SOX Certifications signed by defendants Farrell and Musso that contained representations substantially similar to the representations contained in the 2014 10-K.  Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

**2016 Results and the 2016 10-K**

100.    On March 13, 2017, the Individual Defendants caused the Company to file a Form

10-K (the "2016 10-K") disclosing financial and operational results for the fourth quarter of 2016

and 2016 annually.  The 2016 10-K stated:

> We are developing next-generation product candidates in some of the most important areas of cellular immunotherapy, including hematopoietic stem cell transplantation, or HSCT, chimeric antigen receptor T cell therapy, or CAR T, and T cell receptors, or TCRs. HSCT, also known as bone marrow transplantation, has for decades been curative for many patients with hematological cancers or orphan inherited blood disorders.  However, adoption of HSCT to date has been limited by the risks of transplant-related morbidity and mortality from graft-versus-host-disease, or GvHD, and the potential for serious infections due to the lack of an effective immune system following a transplant. CAR T and TCR cell therapies are an innovative approach in which a patient's T cells are genetically modified to carry chimeric antigen receptors, or CARs, or TCRs which redirect the T cells against cancer cells.  While high objective response rates have been reported in some hematological malignancies, serious and sometimes fatal toxicities have arisen in patients treated with CAR T cell therapies.  These toxicities include instances in which the CAR T cells have caused high levels of cytokines due to over-activation, referred to as "cytokine release syndrome," or CRS, neurologic toxicities and cases in which they have attacked healthy organs.  In each case, these toxicities have sometimes resulted in death.  In solid tumors, where the behavior of CAR T cells is particularly unpredictable and results have been inconsistent, researchers are developing enhanced CAR T cell approaches that raise even greater safety concerns.
>
> Our proprietary CID platform is designed to address these challenges.  Events inside a cell are controlled by cascades of specialized signaling proteins.  CID consists of molecular switches, modified forms of these signaling proteins, which are triggered inside the patient by infusion of a small molecule, rimiducid, instead of by natural upstream signals.  We include these molecular switches in the appropriate immune cells and deliver the cells to the patient in the manner of conventional cellular immunotherapy.  We have developed two such switches:  a "safety switch," designed to initiate programmed cell death, or apoptosis, of the immunotherapy cells, and an "activation switch," designed to stimulate activation and in some cases proliferation and/or persistence of the immunotherapy cells.  Each of our product candidates incorporates one of these switches, for enhanced, real time control of safety and efficacy.
>
> • CaspaCIDe is our safety switch, incorporated into our HSCT and TCR product candidate, where it is inactive unless the patient experiences a serious side effect.  In that event, rimiducid is administered to induce Caspase-9, or

iCaspase, switch activation to fully or partially eliminate the cells, with the goal of terminating or attenuating the therapy and resolving the serious side effect.

- Our "Go" switch incorporated into our GoCAR-T product candidates, is an activation switch designed to allow control of the activation and proliferation of the T cells through the scheduled administration of a course of rimiducid infusions that may continue until the desired patient outcome is achieved. In the event of emergence of side effects, the level of activation of the GoCAR-T cells is designed to be attenuated by extending the interval between rimiducid doses, reducing the dosage per infusion, or suspending further rimiducid administration.

In addition, we have an active research effort to develop other advanced molecular switch approaches, including a "dual-switch" that is designed to provide a user-controlled system for managing persistence and safety of tumor antigen-specific CAR T cells.

By incorporating our novel switch technologies, we are developing product candidates with the potential to elicit positive clinical outcomes and ultimately change the treatment paradigm in various areas of cellular immunotherapy. Our lead clinical product candidate is described below.

- BPX-501 is a CaspaCIDe product candidate designed as an adjunct T cell therapy administered after allogeneic HSCT. BPX-501 is designed to improve transplant outcomes by enhancing the recovery of the immune system following an HSCT procedure. BPX-501 addresses the risk of infusing donor T cells by enabling the elimination of donor T cells through the activation of the CaspaCIDe safety switch if there is an emergence of uncontrolled GvHD.

101. As to the regulatory approval process, the 2016 10-K stated:

We have discussions ongoing with the FDA regarding the regulatory path to approval in the U.S. and we expect to provide updates in the first half of 2017.

* * *

In addition, we are planning to initiate additional Phase 1/2 clinical trials in the U.S. and Europe, as part of our strategy to pursue global regulatory approvals and expand the potential addressable patient population for BPX-501.

102. In connection with the Company's financial and operational results for the fourth quarter of 2016 and 2016 annually, the Individual Defendants published a press release on March 13, 2017, which stated, "On the regulatory front, we clarified our path to approval with BPX-501

42

and rimiducid in Europe, and made substantial progress in dialogue with the FDA on the design of U.S. registration trials." The press release also stated that, "The Company advanced discussions with the U.S. FDA on BPX-501's path for product registration in the U.S."

103.    Additionally, the Individual Defendants held a conference call with investors and analysts on March 13, 2016 in connection with the Company's financial and operational results for the fourth quarter of 2016 and 2016 annually. During the call, defendant Fair stated:

> [O]ur team and our collaborators have made significant clinical and regulatory progress over the past year on BPX-501.
>
> *        *        *
>
> In the U.S., we're pleased to report that we've made substantial progress in our ongoing discussions with the FDA on the design of U.S. registration trials. We expect to conduct two separate trials in pediatric patients receiving haplo-transplants, including a non-randomized trial in patients with orphan inherited blood disorders and a controlled study in patients with blood cancers. We expect to finalize discussions with the FDA on both protocols in the second quarter of this year and begin enrollment for these trials during the second half.

104.    Nevertheless, the above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that: (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

105.    Further, the 2016 10-K included SOX Certifications signed by defendants Farrell and Musso that contained representations substantially similar to the representations contained in the 2014 10-K. Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

**The 2017 Barclays Global Healthcare Conference**

106.    On March 15, 2017, the Company participated in the 2017 Barclays Global Healthcare Conference, where the following two slides were presented:





107.    The slides represented to the investors that other cell therapies lead to toxicity, but BPX-501 eliminates these ill effects.

108.    Nevertheless, the above slides were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that: (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

**1Q2017 Results and the 1Q2017 10-Q**

109.    On May 8, 2017, the Individual Defendants caused the Company to file a Form 10-Q (the "1Q2017 10-Q") with the SEC disclosing the Company's financial and operational results for the first quarter of 2017.  The 1Q2017 10-Q stated:

We are developing next-generation product candidates in some of the most important areas of cellular immunotherapy, including hematopoietic stem cell transplantation, or HSCT, chimeric antigen receptor T cell therapy, or CAR T, and T cell receptors, or TCRs.  HSCT, also known as bone marrow transplantation, has for decades been curative for many patients with hematological cancers or orphan inherited blood disorders.  However, adoption of HSCT to date has been limited by the risks of transplant-related morbidity and mortality from graft-versus-host-disease, or GvHD, and the potential for serious infections due to the lack of an effective immune system following a transplant. CAR T and TCR cell therapies are an innovative approach in which a patient's T cells are genetically modified to carry chimeric antigen receptors, or CARs, or TCRs which redirect the T cells against cancer cells.  While high objective response rates have been reported in some hematological malignancies, serious and sometimes fatal toxicities have arisen in patients treated with CAR T cell therapies.  These toxicities include instances in which the CAR T cells have caused high levels of cytokines due to over-activation, referred to as "cytokine release syndrome," or CRS, neurologic toxicities and cases in which they have attacked healthy organs.  In each case, these toxicities have sometimes resulted in death.  In solid tumors, where the behavior of CAR T cells is particularly unpredictable and results have been inconsistent, researchers are developing enhanced CAR T cell approaches that raise even greater safety concerns.

Our proprietary CID platform is designed to address these challenges.  Events inside a cell are controlled by cascades of specialized signaling proteins.  CID consists of molecular switches, modified forms of these signaling proteins, which are triggered inside the patient by infusion of a small molecule, rimiducid, instead of by natural upstream signals.  We include these molecular switches in the appropriate immune cells and deliver the cells to the patient in the manner of conventional cellular immunotherapy.  We have developed two such switches: a "safety switch," designed to initiate programmed cell death, or apoptosis, of the immunotherapy cells, and an "activation switch," designed to stimulate activation and in some cases proliferation and/or persistence of the immunotherapy cells. Each of our product candidates incorporates one of these switches, for enhanced, real time control of safety and efficacy

- CaspaCIDe is our safety switch, incorporated into our HSCT and TCR product candidate, where it is inactive unless the patient experiences a serious side effect.  In that event, rimiducid is administered to induce Caspase-9, or iCaspase, switch activation to fully or partially eliminate the cells, with the goal of terminating or attenuating the therapy and resolving the serious side effect.

- Our "Go" switch incorporated into our GoCAR-T product candidates, is an activation switch designed to allow control of the activation and proliferation of the T cells through the scheduled administration of a course of rimiducid infusions that may continue until the desired patient outcome is achieved.  In the event of emergence of side effects, the level of activation of the GoCAR-T

cells is designed to be attenuated by extending the interval between rimiducid doses, reducing the dosage per infusion, or suspending further rimiducid administration.

In addition, we have an active research effort to develop other advanced molecular switch approaches, including a "dual-switch" that is designed to provide a user-controlled system for managing persistence and safety of tumor antigen-specific CAR T cells.

By incorporating our novel switch technologies, we are developing product candidates with the potential to elicit positive clinical outcomes and ultimately change the treatment paradigm in various areas of cellular immunotherapy. Our lead clinical product candidate is described below.

- BPX-501 is a CaspaCIDe product candidate designed as an adjunct T cell therapy administered after allogeneic HSCT. BPX-501 is designed to improve transplant outcomes by enhancing the recovery of the immune system following an HSCT procedure. BPX-501 addresses the risk of infusing donor T cells by enabling the elimination of donor T cells through the activation of the CaspaCIDe safety switch if there is an emergence of uncontrolled GvHD.

110.    The Individual Defendants also published a press release on May 8, 2017, which quoted defendant Fair stating, "We continue to make progress on the registration trial for BPX-501, and presented updated clinical data highlighting its potential to transform patients' lives." The press release also stated:

**Preparation Ongoing for U.S. Registration Trials**
Bellicum continues to prepare for pivotal trials of BPX-501 in the U.S. in pediatric patients with orphan inherited blood disorders and blood cancers and in adults with high- and intermediate-risk AML receiving haploidentical transplant.

**Data Update Highlights Promise of BPX-501 Clinical Program**
At the Bone Marrow Transplant (BMT) Tandem Meeting in February, Bellicum reported data from the BP-004 trial which showed a low incidence of transplant-related mortality, rapid immune recovery, a low rate of GvHD that was manageable with standard treatments or rimiducid, and no serious adverse events associated with the use of BPX-501 or rimiducid.

111.    The Individual Defendants published another press release on May 15, 2017, which quoted defendant Fair stating that the company was "prepar[ing] for the expected commercialization of BPX-501. . . ."

112.     Nevertheless, the above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

113.     Further, the 1Q2017 10-Q included SOX Certifications signed by defendants Farrell and Musso that contained representations substantially similar to the representations contained in the 2014 10-K.  Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

**The 22nd Congress of the European Hematology Association**

114.     On June 23, 2017, the Company participated in the 22nd Congress of the European Hematology Association.  An abstract from the Company's poster presentation, co-written by COO Moseley, stated:

> **Conclusion**
> These data suggest that Haplo-HSCT combined with infusion of BPX-501 T cells with a suicide gene may be a safe and curative option for children with hemoglobinopathies and ED who lack a matched donor.  Infusion of gene modified T cells with an inducible suicide mechanism, combined with selective αβ T-cell depletion, offers the potential to rapidly reverse GvHD and eliminate the need for the use of GvHD prophylaxis.  Additionally, this approach results in rapid hematological and immune reconstitution for Haplo-HSCT recipients.

115.     In the oral presentation, co-written by Moseley, it stated:

> **Conclusion**
> Engraftment was brisk and T cell recovery normalized by 6 months.  Overall incidence of severe aGVHD was low and the safety switch was successfully

48

activated with rimiducid infusion. Cumulative incidence of NRM compares favorably to historic controls at the lead center, where a value of 2.4% for matched related donors (MR), 11.8% for matched unrelated donors (MUD) and 5% for αβ T cell depletion haplo HSCT (Haplo αβ) without BPX-501 infusion was recorded (Bertaina, 2015 ASH). The cumulative incidence of relapse was 12.0% for BPX-501, 32.3% for MR, 22.2% for MUDs and 21.9% Haplo-αβ. Disease-free survival in the BPX-501 treated patients was 84.2% compared to 65.4% for MR, 66.1% for MUDs and 73.1% for Haplo-αβ. However, length of follow-up on the control cohorts differed from that of BPX-501 treated patients. These data suggest that BPX-501 T cells modified with the iCasp9 safety switch, infused after selective αβ T-cell depletion, are safe and result in a rapid immune reconstitution and a potentially stronger GvL effect in children with high-risk leukemia who lack a matched donor.

116. The above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that: (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

**2017 S-3s**

117. On June 28, 2017, the Individual Defendants caused the Company to file two S-3 forms, signed by defendants Fair and Musso, which stated, "We have discussions ongoing with the FDA regarding the regulatory path to approval in the U.S. and we expect to provide updates in the first half of 2017."

118. The above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that: (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

**2Q2017 Results and the 2Q2017 10-Q**

119.    On August 8, 2017, the Individual Defendants caused the Company to file a Form 10-Q (the "2Q2017 10-Q") with the SEC disclosing the Company's financial and operational results for the second quarter of 2017.  The 2Q2017 stated, "We are finalizing plans for future U.S. clinical trials of BPX-501.  We plan to pursue one or more clinical trials with the intent of filing for FDA approval."

120.    As to the neurotoxicity issues with CAR-T cell therapies, the 2Q2017 10-Q stated:

> While high objective response rates have been reported in some hematological malignancies, serious and sometimes fatal toxicities have arisen in patients treated with CAR T cell therapies.  These toxicities include instances in which the CAR T cells have caused high levels of cytokines due to over-activation, referred to as "cytokine release syndrome," or CRS, neurologic toxicities and cases in which they have attacked healthy organs.  In each case, these toxicities have sometimes resulted in death.  In solid tumors, where the behavior of CAR T cells is particularly unpredictable and results have been inconsistent, enhanced CAR T cell approaches are being developed that raise even greater safety concerns.

121.    In connection with the results for the second quarter of 2017, the Individual Defendants held a conference call with investors and analysts on August 8, 2017.  During the call, defendant Fair stated:

> Taken together, this affirms our belief that BPX-501 represents not just an important option for these patients, but also a significant commercial opportunity for us.  Based on these findings, we continue to progress toward the market.

> \*       \*       \*

> Our objective for this study is to show superiority to the current standard of care in adult malignant patients who do not have a matched donor and to pursue registration in the U.S. and Europe in this population.

> \*       \*       \*

> We're designing a registrational study in an ultra-orphan pediatric inherited blood disease where the need is most acute and the path to regulatory approval is most direct.  This should allow us to efficiently secure a pediatric approval in the U.S.

> \*       \*       \*

And so, we've recast our plan in the U.S. to focus on a single ultra-orphan disease where the unmet need is the greatest, where the regulatory path is clear and straightforward, so that we can get an FDA approval.  And we believe with the FDA approval, combined with the data set that we've generated across the U.S. and European programs, that U.S. treating physicians will have the information they need.  So, it's a much more streamlined and efficient program, so that we can offer access to pediatric patients.

\*       \*       \*

[W]e have a supportive regulator in the U.S. who buys into the benefit risk profile and is also cognizant of the issues that we will face in manufacturing and long-term safety follow-up that we were all vigilant about.  But, we think they've offered a very realistic path to market for cell therapy and I think that's positive news for the whole community including us.

\*       \*       \*

We don't have any pushback on the program that we have previously been devising in pediatrics in the U.S. from the FDA.  We, as I indicated it, underwent a thorough strategic review of our entire portfolio, but particularly on BPX-501, recently concluded that and made the decision based on strategic priorities.  As I mentioned, we felt like it wasn't the best use of our resources to do a large basket like trial in pediatrics in the U.S. that essentially replicated the BP-004 trial and the comparative MUD trial, which is the type of program that would have been required to get a comparable label.  We see the largest opportunity in adult malignant setting and want to prioritize our resources there and on our future pipeline.  But what we did see is the opportunity to provide access in the U.S. by a streamlined program to get an FDA approval and to leverage the totality of the data that we will have.

\*       \*       \*

Third, as the cell therapy field evolves and advances, we remain convinced that our molecular switch platform to control the efficacy and safety of these therapies is increasingly relevant and the best-in-class."

\*       \*       \*

"I believe we have an industry-leading platform that has the promise to do just this and we continue to invest to optimize it.  During the quarter, we presented an exciting preclinical data on our novel dual-switch technology at AACR.  The potential advantage of a dual switch is the ability to both activate cells to enhance efficacy, and eliminate them to manage toxicity in a single product."

\*       \*       \*

"So, that's the trial design that we're working with.  As far as providing more color about details about that endpoint sample size, we'll do that after we've had a chance to discuss the protocol with FDA.  And so, when we come to you, we'll have a trial design that we're about to implement and that we're comfortable that we will be registration or sending positive outcome.

122.    On the August 8 earnings call Fair also claims that BPX-501's safety is "best-in-class" and on the verge of an FDA registration study, despite awareness of severe flaws in the clinical program and three cases of encephalopathy in pediatric patients treated with BPX-501.

123.    Additionally, the Individual Defendants published a press release on August 8, 2018, which quoted defendant Fair as stating "We continue to be encouraged by the results from our ongoing BPX-501 pediatric studies and our progress toward a filing in Europe.  We have adjusted our plans for U.S. registrational trials to enable an efficient path to seeking approvals for the greatest areas of unmet need."  The press release also stated that, "Bellicum is finalizing plans for the design of registrational trials of BPX-501 in the U.S."

124.    The above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

125.    Further, the 2Q2017 10-Q included SOX Certifications signed by defendants Farrell and Musso that contained representations substantially similar to the representations contained in the 2014 10-K.  Defendants Farrell's and Musso's representation that the Company has adequate internal control over financial reporting was materially false and misleading because

Defendants Farrell and Musso failed to disclose the materially adverse information discussed above.

### The Ladenburg Thalmann 2017 Healthcare Conference

126.     In September 2017, the Company presented at the Ladenburg Thalmann 2017 Healthcare Conference.  One of the slides was as follows:



127.     In this slide on regulatory strategy for BPX-501, Bellicum is claiming they are "fast to market in pediatrics" and are on track for trials for adults, though Defendants knew the clinical program procedures regarding monitoring and managing of adverse events suffered severe flaws that could lead the FDA to place a hold on the clinical studies, particularly given three undisclosed cases of encephalopathy plausibly related to BPX-501 suffered during the trial.

128.    In the following two slides, the Company stated that "Most cell therapies can only be controlled before infusion," and that after infusion, lack of control and unpredictability can lead to issues such as "neurotoxicity."





129.    Additionally, in the presentation, the following slide was presented to highlight risks and benefits of "T-Cells in Allogeneic HSCT," which is what BPX-501 does, and lists only "Graft vs. Host disease," while leaving out neurotoxicity/encephalopathy, despite these presentations occurring after the Individual Defendants' awareness of the cases of encephalopathy.



130.    On November 15, 2017, the Company also presented the virtually same materials at the Jefferies 2017 London Healthcare Conference.

131.    The above presentations were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

**3Q2017 Results and the 3Q2017 10-Q**

132.    On November 7, 2017, the Individual Defendants caused the Company to file a Form 10-Q (the "3Q2017 10-Q") with the SEC disclosing the Company's financial and operational results for the third quarter of 2017.  The 3Q2017 10-Q stated:

We are working on plans and assessing feasibility for future U.S. clinical trials of BPX-501.  We expect to pursue one or more clinical trials with the intent of an eventual filing for regulatory approval in the U.S.

133.    In connection with the Company's third quarter of 2017 results, the Individual Defendants also published a press release on November 7, 2017, which stated:

Enrollment in our clinical program for BPX-501 remains on track and we progressed our plans for future trials in adult AML and a pediatric orphan blood disorder. . . .

*      *      *

- **Company Prepares for Additional BPX-501 Trials in U.S.**
  Planning is ongoing for two additional trials of BPX-501 to expand the eligible patient population and support potential U.S. registration.  These trials are being developed in adult patients with acute myeloid leukemia (AML) and in a distinct orphan inherited blood disorder patient population.

134.    The above statements were materially false and/or misleading at the time they were made because the Individual Defendants failed to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

**THE TRUTH IS REVEALED**

135.    On January 30, 2018, after the market closed, the Individual Defendants issued a press release disclosing that the FDA placed a hold on BPX-501 clinical trials.  The press release stated:

Bellicum Pharmaceuticals, Inc. (NASDAQ: BLCM), a leader in developing novel, controllable cellular immunotherapies for cancers and orphan inherited blood disorders, today announced that the Company has received notice from the U.S. Food and Drug Administration (FDA) that U.S. studies of BPX-501 have been placed on a clinical hold following three cases of encephalopathy deemed as possibly related to BPX 501.

57

Bellicum is awaiting formal communications from the FDA to determine the requirements for resuming studies, and will be working closely with the FDA to address their questions.

136.     On this news, the price of the Company's shares fell over 25% or $2.12 to close at $6.08 on January 31, 2018.

137.     The press release disclosed for the first time what the Individual Defendants had known all along, that BPX-501 contains a risk of neurological adverse events such as encephalopathy that can lead to serious harm, including death.

138.     The clinical trial process also showed that the procedures and safety protocols had severe flaws and did not meet the FDA requirements.

139.     On March 13, 2018, the Individual Defendants caused the Company to file a Form 10-K (the "2017 10-K") disclosing the Company's financial and operational results for the fourth quarter of 2017 and 2017 annually.  In the 2017 10-K, the Individual Defendants explained that the Company could not conduct any clinical trials on BPX-501 during the duration of the hold. Further, the Individual Defendants disclosed that the FDA hold also raised a risk that foreign regulatory authorities would similarly impose clinical holds on ongoing trials of BPX-501, "which would significantly delay our development and could end our development of BPX-501."

140.     In a related conference call with analysts and investors held on March 13, 2018, defendant Fair revealed that FDA asked Bellicum to update its protocols and make clarifications for investigators about monitoring and managing neurotoxicity and all related adverse events in order to lift the hold and continue their trials.

**THE DIRECTOR DEFENDANTS ISSUED A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT DURING THE RELEVANT PERIOD.**

141.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Director Defendants also caused the Company to issue a

false and misleading proxy statement during the Relevant Period.   The Director Defendants drafted, approved, reviewed, and/or signed three Forms DEF14A before they were filed with the SEC and disseminated to Bellicum's stockholders on April 21, 2015 (the "2015 Proxy"), April 27, 2016 (the "2016 Proxy"), and April 26, 2017 (the "2017 Proxy").   The Director Defendants negligently issued materially misleading statements in the 2015 Proxy, the 2016 Proxy, and the 2017 Proxy.   These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.   Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

142.    The 2015 Proxy sought stockholder votes to, among others, elect defendants McGuyer and Stonehouse for a three-year term.

143.    In support the Director Defendants' bid to reelect defendants McGuyer and Stonehouse, the Director Defendants highlighted their supposed oversight of the Company.   In particular, the 2015 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Bellicum faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.   The 2015 Proxy stated:

> One of the key functions of our Board of Directors is informed oversight of our risk management process.   Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of our Board of Directors that address risks inherent in their respective areas of oversight.   In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure and our audit committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken.   The audit committee also monitors compliance with legal and regulatory requirements.   Our nominating and corporate governance

committee monitors the effectiveness of our corporate governance practices, including whether they are successful in preventing illegal or improper liability-creating conduct.  Our compensation committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

*      *      *

**Audit Committee**

The Audit Committee of the Board of Directors was established by the Board in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to oversee the Company's corporate accounting and financial reporting processes and audits of its financial statements. For this purpose, the Audit Committee performs several functions, including, among other things:

- evaluating the performance, independence and qualifications of our independent auditors and determining whether to retain our existing independent auditors or engage new independent auditors;

- reviewing and approving the engagement of our independent auditors to perform audit services and any permissible non-audit services;

- monitoring the rotation of partners of our independent auditors on our engagement team as required by law;

- prior to engagement of any independent auditor, and at least annually thereafter, reviewing relationships that may reasonably be thought to bear on their independence, and assessing and otherwise taking the appropriate action to oversee the independence of our independent auditor;

- reviewing our annual and quarterly financial statements and reports, including the disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations," and discussing the statements and reports with our independent auditors and management;

- reviewing with our independent auditors and management significant issues that arise regarding accounting principles and financial statement presentation and matters concerning the scope, adequacy and effectiveness of our financial controls;

- reviewing with management and our auditors any earnings announcements and other public announcements regarding material developments;

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding financial controls, accounting or auditing matters and other matters;

- preparing the report that the SEC requires in our annual proxy statement;

- reviewing and providing oversight of any related-person transactions in accordance with our related-person transaction policy and reviewing and monitoring compliance with legal and regulatory responsibilities, including our code of business conduct and ethics;

- reviewing our major financial risk exposures, including the guidelines and policies to govern the process by which risk assessment and risk management is implemented;

- reviewing on a periodic basis our investment policy; and

- reviewing and evaluating on an annual basis the performance of the Audit Committee and the Audit Committee charter.

*      *      *

**Report of the Audit Committee of the Board of Directors**

The Audit Committee has reviewed and discussed the audited financial statements for the fiscal year ended December 31, 2014 with management of the Company. The Audit Committee has discussed with the independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16, *Communications with Audit Committees,* as adopted by the Public Company Accounting Oversight Board ("PCAOB"). The Audit Committee has also received the written disclosures and the letter from the independent registered public accounting firm required by applicable requirements of the PCAOB regarding the independent accountants' communications with the Audit Committee concerning independence, and has discussed with the independent registered public accounting firm the accounting firm's independence. Based on the foregoing, the Audit Committee has recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2014.

144.    The 2015 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with Bellicum's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices, and acting in an ethical and legal manner.   In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

145.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants McGuyer and Stonehouse.

146.    The 2016 Proxy sought stockholder votes to, among others, elect defendants Brown and Slawin for a three-year term.

147.    In support the Director Defendants' bid to reelect defendants Brown and Slawin, the Director Defendants highlighted their supposed oversight of the Company.  In particular, the 2016 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Bellicum faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2016 Proxy stated:

> One of the key functions of our Board of Directors is informed oversight of our risk management process.  Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of our Board of Directors that address risks inherent in their respective areas of oversight.  In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure and our audit committee has the responsibility to consider and discuss our major financial risk exposures and the

steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken.  The audit committee also monitors compliance with legal and regulatory requirements.  Our nominating and corporate governance committee monitors the effectiveness of our corporate governance practices, including whether they are successful in preventing illegal or improper liability-creating conduct.  Our compensation committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

*        *        *

**Audit Committee**

The Audit Committee of the Board of Directors was established by the Board in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to oversee the Company's corporate accounting and financial reporting processes and audits of its financial statements. For this purpose, the Audit Committee performs several functions, including, among other things:

- evaluating the performance, independence and qualifications of our independent auditors and determining whether to retain our existing independent auditors or engage new independent auditors;

- reviewing and approving the engagement of our independent auditors to perform audit services and any permissible non-audit services;

- monitoring the rotation of partners of our independent auditors on our engagement team as required by law;

- prior to engagement of any independent auditor, and at least annually thereafter, reviewing relationships that may reasonably be thought to bear on their independence, and assessing and otherwise taking the appropriate action to oversee the independence of our independent auditor;

- reviewing our annual and quarterly financial statements and reports, including the disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations," and discussing the statements and reports with our independent auditors and management;

- reviewing with our independent auditors and management significant issues that arise regarding accounting principles and

financial statement presentation and matters concerning the scope, adequacy and effectiveness of our financial controls;

- reviewing with management and our auditors any earnings announcements and other public announcements regarding material developments;

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding financial controls, accounting or auditing matters and other matters;

- preparing the report that the SEC requires in our annual proxy statement;

- reviewing and providing oversight of any related-person transactions in accordance with our related-person transaction policy and reviewing and monitoring compliance with legal and regulatory responsibilities, including our code of business conduct and ethics;

- reviewing our major financial risk exposures, including the guidelines and policies to govern the process by which risk assessment and risk management is implemented;

- reviewing on a periodic basis our investment policy; and

- reviewing and evaluating on an annual basis the performance of the Audit Committee and the Audit Committee charter.

*        *        *

**Report of the Audit Committee of the Board of Directors**

The Audit Committee has reviewed and discussed the audited financial statements for the fiscal year ended December 31, 2015 with management of the Company. The Audit Committee has discussed with the independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16, as amended, Communications with Audit Committees, as adopted by the Public Company Accounting Oversight Board ("PCAOB"). The Audit Committee has also received the written disclosures and the letter from the independent registered public accounting firm required by applicable requirements of the PCAOB regarding the independent accountants' communications with the Audit Committee concerning independence, and has discussed with the independent registered public accounting firm the accounting firm's independence. Based on the foregoing, the Audit Committee has recommended to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2015.

148.    The 2016 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with Bellicum's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner.   In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

149.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Brown and Slawin.

150.    The 2017 Proxy sought stockholder votes to, among others, elect defendants McGuyer and Stonehouse for a three-year term.

151.    In support the Director Defendants' bid to reelect defendants Fair, Daly, and Huber, the Director Defendants highlighted their supposed oversight of the Company.  In particular, the 2017 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Bellicum faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2017 Proxy stated:

> One of the key functions of our Board of Directors is informed oversight of our risk management process.  Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of our Board of Directors that address risks inherent in their respective areas of oversight.  In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure and our audit committee has the

responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken.  The audit committee also monitors compliance with legal and regulatory requirements.  Our nominating and corporate governance committee monitors the effectiveness of our corporate governance practices, including whether they are successful in preventing illegal or improper liability-creating conduct.  Our compensation committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

*       *       *

**Audit Committee**

The Audit Committee of the Board of Directors was established by the Board in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to oversee the Company's corporate accounting and financial reporting processes and audits of its financial statements. For this purpose, the Audit Committee performs several functions, including, among other things:

- evaluating the performance, independence and qualifications of our independent auditors and determining whether to retain our existing independent auditors or engage new independent auditors;

- reviewing and approving the engagement of our independent auditors to perform audit services and any permissible non-audit services;

- monitoring the rotation of partners of our independent auditors on our engagement team as required by law;

- prior to engagement of any independent auditor, and at least annually thereafter, reviewing relationships that may reasonably be thought to bear on their independence, and assessing and otherwise taking the appropriate action to oversee the independence of our independent auditor;

- reviewing our annual and quarterly financial statements and reports, including the disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations," and discussing the statements and reports with our independent auditors and management;

- reviewing with our independent auditors and management significant issues that arise regarding accounting principles and financial statement presentation and matters concerning the scope, adequacy and effectiveness of our financial controls;

- reviewing with management and our auditors any earnings announcements and other public announcements regarding material developments;

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding financial controls, accounting or auditing matters and other matters;

- preparing the report that the SEC requires in our annual proxy statement;

- reviewing and providing oversight of any related-person transactions in accordance with our related-person transaction policy and reviewing and monitoring compliance with legal and regulatory responsibilities, including our code of business conduct and ethics;

- reviewing our major financial risk exposures, including the guidelines and policies to govern the process by which risk assessment and risk management is implemented;

- reviewing on a periodic basis our investment policy; and

- reviewing and evaluating on an annual basis the performance of the Audit Committee and the Audit Committee charter;

*      *      *

**Report of the Audit Committee of the Board of Directors**

The Audit Committee as reviewed and discussed the audited financial statements for the fiscal year ended December 31, 2016 with management of the Company.  The Audit Committee has discussed with the independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16, as amended, Communications with Audit Committees, as adopted by the Public Company Accounting Oversight Board ("PCAOB").  The Audit Committee has also received the written disclosures and the letter from the independent registered public accounting firm required by applicable requirements of the PCAOB regarding the independent accountants' communications with the Audit Committee concerning independence, and has discussed with the independent registered public accounting firm the accounting firm's independence.  Based on the foregoing, the Audit Committee has recommended to the

Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2016.

152.     The 2017 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with Bellicum's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner.   In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose to investors that:   (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

153.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Fair, Daly, and Huber.

**THE INSIDER SELLING DEFENDANTS SOLD SUBSTANTIAL SHARES OF BELLICUM STOCK WHILE IN POSSESSION OF MATERIAL, ADVERSE, INFORMATION REGARDING THE COMPANY'S BUSINESS**

154.     During the Relevant Period, certain of the Individual Defendants—specifically, the Insider Selling Defendants—engaged in numerous sales of Bellicum common stock while in possession of material information that was adverse to Bellicum's business.

155.     While the price of Bellicum stock was artificially inflated and defendant Farrell was in possession of material, adverse nonpublic information, he sold 7,500 shares of personally held Bellicum stock for proceeds of $128,993.

156.     While the price of Bellicum stock was artificially inflated and defendant Musso was in possession of material, adverse nonpublic information, he sold 88,234 shares of personally

held Bellicum stock for proceeds of $1.52 million, including 23,323 shares for proceeds of $221,050 sold during November and December 2017.

157.    While the price of Bellicum stock was artificially inflated and defendant Moseley was in possession of material, adverse nonpublic information, she sold 120,000 shares of personally held Bellicum stock for proceeds of $2.16 million.

158.    While the price of Bellicum stock was artificially inflated and defendant Slawin was in possession of material, adverse nonpublic information, he sold 280,000 shares of personally held Bellicum stock for proceeds of $4.51 million.

159.    In making the insider trades, the Insider Selling Defendants were able to unjustly profit from artificially high trading levels stemming from the Individual Defendants' concerted false and misleading statements disseminated to the market.

## DAMAGES TO THE COMPANY

160.    As a result of the Individual Defendants' wrongful conduct, Bellicum disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Bellicum's credibility. Bellicum has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

161.    Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

162.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Bellicum's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

163.    Moreover, these actions have irreparably damaged Bellicum's corporate image and goodwill.  For at least the foreseeable future, Bellicum will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Bellicum's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

164.    Plaintiffs incorporate the allegations herein by reference.

165.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

166.    Plaintiffs are stockholders of Bellicum, were stockholders of Bellicum at the time of the wrongdoing alleged herein, and have been stockholders of Bellicum continuously since that time.

167.    Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

168.    As a result of the facts set forth herein, Plaintiffs have not made any demand on the Bellicum Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

169.    At the time of the filing of this complaint, the Bellicum Board consists of the following eight individuals:  defendants Fair, Brow, Daly, Davis, Huber, Stonehouse and non-defendants Edmund P. Harrigan ("Harrigan") and Judith Klimovsky ("Klimovsky").

170.     As a result of the facts set forth herein, Plaintiffs have not made any demand on the Bellicum Board to institute this action against the Individual Defendants, the Wanda Defendants, and the Silver Lake Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the current members of the Board because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

171.     The Individual Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

172.     Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or recklessly allowed, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial

likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Bellicum to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Individual Defendants.

173.    Further, defendant Fair is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.  Additionally, defendant Fair is not independent because his principal income comes from his employment with Bellicum.  In 2018 alone, defendant Fair received $3,278,125 from the Company in compensation.

**DEMAND IS EXCUSED AS TO DEFENDANTS DALY, DAVIS, AND HUBER AND NON-DEFENDANT HARRIGAN BECAUSE OF THEIR OVERLAPPING BUSINESS AFFILIATIONS**

174.    Defendants Daly, Davis, and Huber and non-defendant Harrigan have long-standing professional and personal ties with each other.  Due to their close relationships, and conflicts of interests arising therefrom, defendants Daly, Davis, and Huber and non-defendant Harrigan cannot take the necessary and proper steps to investigate and remedy the Individual Defendants' wrongdoing.  Defendants Daly, Davis, and Huber and non-defendant Harrigan are incapable of independently and impartially consider a demand to commence and vigorously prosecute this action.

175.    First, defendants Davis, Daly, and non-defendant Harrigan all serve as members of ACADIA Pharmaceuticals Inc.'s board.  ACADIA Pharmaceuticals Inc. is a biopharmaceutical company, and defendant Davis has been President, CEO, and a director of the board.

176.    Second, defendant Davis and nondefendant Harrigan worked together at Neurogen Corporation.  Defendant Daly was a director of Neurogen Corporation between September 2001

and December 2009 while non-defendant Harrigan was Neurogen's Executive Vice President and Chief Development Officer between May 2002 and March 2003.

177.   Third, defendants Daly and Huber worked together at Incyte Corporation. Defendant Daly was the Executive Vice President and Chief Commercial Officer of Incyte Corporation between October 2012 and June 2015 while defendant Huber has been the Executive Vice President and Chief Scientific Officer of Incyte Corporation since April 2014.  Defendant Huber also worked at Incyte in various management roles at Incyte Corporation between January 2002 and April 2014.

178.   Due to their long-standing professional and personal ties with each other defendants Daly, Davis, and Huber and non-defendant Harrigan are incapable of impartially considering a demand to commence and vigorously prosecute this action, and, thus, the demand upon them is excused.

## DEMAND IS EXCUSED AS TO THE AUDIT COMMITTEE DEFENDANTS BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

179.   As members of the Audit Committee during the Relevant Period, the Audit Committee Defendants participated in and knowingly approved filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to oversee and monitor (a) the integrity of the Company's financial statements, and (b) the Company's compliance with legal and regulatory requirements. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory

requirements, as required by the Audit Committee Charter.  For this reason, demand is futile as to the Audit Committee Defendants.

## COUNT I
### BREACH OF FIDUCIARY DUTY
### (Against the Individual Defendants)

180.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

181.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Bellicum's business and affairs.

182.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

183.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Bellicum.

184.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

185.    In addition, the Individual Defendants further breached their fiduciary duties owed to Bellicum by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, to investors that:  (i) patients treated with BPX-501 developed encephalopathy during clinical testing; (ii) the Company's clinical trial procedures and protocols had a deficiency in their monitoring and management of neurological adverse events, like encephalopathy; and (iii) the foregoing raised a risk that the FDA would halt the trials or even decline to approve the drug altogether.

186.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

187.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

188.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

189.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

190.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Bellicum has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191.    Plaintiffs on behalf of Bellicum have no adequate remedy at law.

## COUNT II
### VIOLATIONS OF SECTIONS 10(B) AND 21D OF THE EXCHANGE ACT
**(Against the Defendants Farrell, Fair, Musso, and Moseley)**

192.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

193.    Bellicum is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for, *inter alia*, violations of § 10(b) of the Exchange Act. If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the defendants as alleged herein.  The Company is entitled to receive contribution from those defendants in connection with the Securities Class Action against the Company.

194.    Defendants Farrell, Fair, Musso, and Moseley as directors and officers and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Bellicum, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and Rule 10b-5.  Further, defendants Farrell, Fair, Musso, and Moseley are liable under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

195.    As a result, defendants Farrell, Fair, Musso, and Moseley damaged Bellicum and are liable to the Company for contribution.

## COUNT III
### VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT
**(Against the Director Defendants)**

196.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

197.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

198.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2015, 2016, and 2017 Proxies.  In the 2015, 2016, and 2017 Proxies, the Board solicited stockholder votes to reelect certain of the Director Defendants to the Board.

199.    The 2015, 2016, and 2017 Proxies, however, misrepresented and failed to disclose, among others, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Individual Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Bellicum misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants the Board.

200.    Plaintiffs, on behalf of Bellicum, thereby seek relief for damages inflicted upon the Company based upon the misleading 2015, 2016, and 2017 Proxies in connection with the improper reelection of the Director Defendants to the Board.

## COUNT IV
### WASTE OF CORPORATE ASSETS
### (Against Individual Defendants)

201.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

202.    As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, Bellicum is subject to the Securities Class Action.  The Individual Defendants have caused Bellicum to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

203.    As a result of this waste of corporate assets, the Company has been damaged and the Individual Defendants are each liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Declaring that Plaintiffs may maintain this derivative action on behalf of Bellicum and that Plaintiffs are proper and adequate representatives of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 1, 2019

Respectfully Submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
Telephone: (302) 984-3800
Email: bbennett@coochtaylor.com

*Attorney for Plaintiff*

**OF COUNSEL**

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Marion C. Passmore
Garam Choe
Alexandra B. Raymond
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 355-4648

*Attorneys for Plaintiff*